

## Fourth Court of Appeals
### San Antonio, Texas

### MEMORANDUM OPINION

No. 04-25-00409-CV

**IN THE INTEREST OF J.A.B.**, S.M.E., C.C.E., and M.B.E., Children

From the 224th Judicial District Court, Bexar County, Texas
Trial Court No. 2024-PA-00777
Honorable Charles E. Montemayor, Judge Presiding

Opinion by:   Irene Rios, Justice

Sitting:        Irene Rios, Justice
                Adrian A. Spears II, Justice
                Velia J. Meza, Justice

Delivered and Filed: December 17, 2025

AFFIRMED

Appellants Mother and Father C.J.E. appeal the trial court's order terminating their parental rights to their children.[1]  Father challenges the sufficiency of the evidence supporting the trial court's finding under statutory ground (E).  Father and Mother both challenge the sufficiency of the evidence supporting the trial court's findings that termination of their parental rights was in their respective children's best interests.  We affirm.

---

[1] To protect the identity of minor children in an appeal from an order terminating parental rights, we refer to the parents as "Mother" and "Father" and we refer to the children using their initials or as "the children."  *See* TEX. FAM. CODE ANN. § 109.002(d); TEX. R. APP. P. 9.8(b)(2).  The trial court also terminated two other fathers' parental rights; however, neither of those fathers appeal.

**BACKGROUND**

The Department became involved in the underlying case when its investigation from a referral led the Department to believe that Father physically abused J.A.B. On May 13, 2024, the Department filed a petition seeking termination of Father's and Mother's parental rights to their respective children. The trial court held a bench trial on May 30, 2025. The trial court heard testimony from Delilah Martinez, Father's counselor; Sherrell Gibbs, a substance use program specialist for the Department; Jessica Barrera, the Department's removal investigator; Aleta Worden, the Department's caseworker; Myra Tellez, the Department's caseworker from December 2024 to April 2025 while Worden was on maternity leave; S.H., C.C.E.'s foster mother; Father; and Mother.

On June 26, 2025, the trial court signed an order terminating Mother's parental rights to all the children and terminating Father's parental rights to his children, S.M.E., C.C.E., and M.B.E. The trial court terminated Father's parental rights based on statutory grounds (E), (N), (O), and (P) in subsection 161.001(b)(1) of the Texas Family Code. *See* TEX. FAM. CODE ANN. §§ 161.001(b)(1)(E), (N), (O), (P). The trial court terminated Mother's parental rights based on statutory grounds (D), (N), (O), and (P) in subsection 161.001(b)(1) of the Texas Family Code. *See* TEX. FAM. CODE ANN. §§ 161.001(b)(1)(D), (N), (O), (P). The trial court also found it was in the children's best interests to terminate Father's and Mother's parental rights. *See id.* § 161.001(b)(2). Father and Mother appeal.

**STATUTORY REQUIREMENTS AND STANDARD OF REVIEW**

To terminate parental rights pursuant to section 161.001 of the Texas Family Code, the Department has the burden to prove by clear and convincing evidence: (1) one of the predicate grounds in subsection 161.001(b)(1); and (2) that termination is in the best interest of the child.

TEX. FAM. CODE ANN. § 161.001(b). Clear and convincing evidence requires "proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id.* § 101.007.

When reviewing the sufficiency of the evidence, we apply well-established standards of review. *See id.* §§ 101.007, 161.206(a); *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006) (conducting a factual sufficiency review); *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005) (conducting a legal sufficiency review).

"In reviewing the legal sufficiency of the evidence to support the termination of parental rights, we must 'look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true.'" *In re J.L.B.*, No. 04-17-00364-CV, 2017 WL 4942855, at *2 (Tex. App.—San Antonio Nov. 1, 2017, pet. denied) (mem. op.) (quoting *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002)). "[A] reviewing court must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so." *J.F.C.*, 96 S.W.3d at 266. "A corollary to this requirement is that a [reviewing] court should disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible." *Id.*

"In reviewing the factual sufficiency of the evidence to support the termination of parental rights, we 'must give due consideration to evidence that the factfinder could reasonably have found to be clear and convincing.'" *J.L.B.*, 2017 WL 4942855, at *2 (quoting *J.F.C.*, 96 S.W.3d at 266). "A [reviewing court] should consider whether disputed evidence is such that a reasonable factfinder could not have resolved that disputed evidence in favor of its finding." *J.F.C.*, 96 S.W.3d at 266. "The [reviewing] court must hold the evidence to be factually insufficient if, in light of the entire record, the disputed evidence contrary to the judgment is so significant that a

reasonable factfinder could not have resolved that disputed evidence in favor of the ultimate finding." *In re M.T.C.*, No. 04-16-00548-CV, 2017 WL 603634, at *2 (Tex. App.—San Antonio Feb. 15, 2017, no pet.) (mem. op.).

Further, in a bench trial, the trial court is the sole judge of the credibility of witnesses and the weight to be given their testimony. *In re J.F.-G.*, 627 S.W.3d 304, 312, 317 (Tex. 2021). This is because "the trial judge is best able to observe and assess the witnesses' demeanor and credibility, and to sense the 'forces, powers, and influences' that may not be apparent from merely reading the record on appeal." *Coburn v. Moreland*, 433 S.W.3d 809, 823 (Tex. App.—Austin 2014, no pet.) (quoting *In re A.L.E.*, 279 S.W.3d 424, 427 (Tex. App.—Houston [14th Dist.] 2009, no pet.)). We, therefore, defer to the trial court's factual determinations and judgment regarding credibility. *J.F.-G.*, 627 S.W.3d at 312; *see also In re R.R.A.*, 687 S.W.3d 269, 279 n.50 (Tex. 2024) ("Reviewing courts, however, must defer to the factfinder's judgment as to the credibility of the witnesses and the weight to give their testimony, including reasonable and logical inferences from the evidence.").

## STATUTORY GROUNDS FOR TERMINATION

In his first issue, Father argues the evidence is insufficient to support the trial court's findings under statutory ground (E).

Only one predicate ground finding under subsection 161.001(b)(1) is necessary to support a termination judgment when there is also a finding that termination is in the child's best interest. *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003). Therefore, our analysis is usually complete if we conclude that the evidence is sufficient to support any single predicate ground. Because the findings under subsections 161.001(b)(1)(D) and (E) have consequences for termination of parental rights as to other children, termination on these grounds implicates significant due process

concerns for Father C.H. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(D), (E), (M); *In re N.G.*, 577 S.W.3d 230, 234 (Tex. 2019). Here, due process requires us to review the trial court's findings under subsection 161.001(b)(1)(E) of the Texas Family Code. *See In re C.W.*, 586 S.W.3d 405, 407 (Tex. 2019) ("[W]hen a trial court makes a finding to terminate parental rights under section 161.001(b)(1)(D) or (E) and the parent challenges that finding on appeal, due process requires the appellate court to review that finding and detail its analysis.").

Assuming a valid best-interest finding, the trial court may order termination of the parent-child relationship if the trial court finds by clear and convincing evidence that the parent has "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional wellbeing of the child[.]" *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(E). Under subsection E, endangerment encompasses "more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment . . . ." *Tex. Dep't of Hum. Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987). Instead, to endanger means to expose the child to loss or injury or to jeopardize his or her emotional or physical well-being. *Id.* The trial court must determine "whether evidence exists that the endangerment of the child's physical well-being was the direct result of [the parent's] conduct, including acts, omissions, or failures to act." *In re M.E.-M.N.*, 342 S.W.3d 254, 262 (Tex. App.—Fort Worth 2011, pet. denied).

Under subsection E, the cause of the endangerment must be the parent's conduct and must be the result of a conscious course of conduct rather than a single act or omission. *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.). "It is not necessary that the parent's conduct be directed at the child or that the child actually be injured; rather, a child is endangered when . . . the parent's course of conduct creates a potential for danger which the parent is aware of but disregards." *In re R.S.-T.*, 522 S.W.3d 92, 110 (Tex. App.—San Antonio 2017, no pet.); *see*

*also In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009) ("[E]ndangering conduct is not limited to actions directed towards the child."). "Courts may further consider parental conduct that did not occur in the child's presence, including conduct before the child's birth or after he was removed from a parent's care." *In re A.B.R.*, No. 04-19-00631-CV, 2020 WL 1159043, at *3 (Tex. App.— San Antonio Mar. 11, 2020, pet. denied) (mem. op.).

"Domestic violence, want of self-control and propensity for violence may be considered as evidence of endangerment." *See R.S.-T.*, 522 S.W.3d at 110. "Texas courts routinely consider evidence of parent-on-parent physical abuse in termination cases without specifically requiring evidence that the conduct resulted in a criminal conviction." Id.

Here, the trial court heard evidence that Father gave J.A.B. a black eye when he punched or slapped him. When J.A.B. was going to scream, Father covered his mouth so other people would not hear his reaction. Father's counselor categorized Father's abuse of J.A.B. as severe. The Department asked Father why the children were removed and Father responded:

A. Because of the fact that I did something that I wasn't supposed to.

Q. And what was that you did?

A. I physically slapped—

Q. Physically slapped who?

A. I want to plead the Fifth.

Q. Did you talk to detectives about that incident?

A. Yes, ma'am, I did.

Q. And were you arrested after speaking with those detectives?

A. Yes.

Q. And you are still pending indictment; is that correct?

A. Yes, ma'am.

. . . .

Q. You also told the detectives that you covered [J.A.B.'s] mouth with your hand and you were uncertain for how long you covered his mouth.

A. I just covered his mouth.

Q. Do you recall telling the detective that?

A. I plead the Fifth.

When asked by the Department, Father confirmed that he told several people that he only hit J.A.B., and did not cover his mouth. During this questioning counsel asked:

Q. So you now deny covering his mouth?

A. I covered his mouth because of the fact is that there was people that were living beside us that were working, because he was trying to get attention.

Father invoked the Fifth Amendment because there is a pending charge for bodily injury to a child stemming from the incident with J.A.B. The trial court warned Father before he testified that it was entitled to draw a negative inference from Father's invocation of the Fifth Amendment in this parental termination trial, especially considering the other children made an outcry of the abuse. *See In re A.R.P.*, No. 04-23-00668-CV, 2024 WL 251957, at *2 (Tex. App.—San Antonio Jan. 24, 2024, no pet.) (mem. op.) (holding the factfinder is free to draw a negative inference when a parent invokes his Fifth Amendment right against self-incrimination to specific questions); *In re G.V.S.*, No. 04-18-00563-CV, 2018 WL 6624398, at *3 (Tex. App.—San Antonio Dec. 19, 2018, pet. denied) (mem. op.) ("The Fifth Amendment . . . does not forbid adverse inferences against witnesses in civil actions [and] the trial court, as the [factfinder], was free to draw negative inferences regarding Father's criminal history based on his refusal to answer questions relating to those issues."); *see also In re D.J.R.*, No. 04-23-00568-CV, 2023 WL 8246666, at *5 (Tex. App.—San Antonio Nov. 29, 2023, no pet.) (mem. op.) ("Although parental rights are constitutional in nature, a termination proceeding is a civil proceeding for purposes of the privilege against self-incrimination."). One child told the removing investigator that the abuse caused J.A.B. to bleed.

Then, Father made the children clean up the blood before his former girlfriend came home. C.C.E. told his foster mother, S.H., that he loves his dad, "but I really like to have another dad, one that's nicer." He also told S.H. that "dad . . . beat them" when they were in his custody.

In addition to the incident with J.A.B., there was evidence presented at trial that showed Father has had a long history of domestic violence with Mother and that the children witnessed repeated occurrences of domestic violence. For example, Father admitted that he was previously arrested for assaulting Mother in the children's presence. Mother testified there was domestic violence between her and Father for the entire eight-year period they were together. Mother testified Father would hit her in the back and she would take "whoopings for the kids." She testified she's been beaten up by Father, he has pistol whipped her, and that the children witnessed all this abuse. Further, the abuse was sometimes directed towards the children. The trial court heard testimony that Father "would get really, really angry" and take the children to the bathroom. They would come out of the bathroom saying they got hurt. Mother testified she would see belt and hand marks on the children. Mother claimed she took pictures of the injuries with her phone, but Father would take her phone and break it.

S.M.E. told Aleta Worden, the Department's caseworker, that Father used to pull her hair and pull Father's former girlfriend's hair. She also stated Father would hit all the children and she witnessed Father hit his former girlfriend. M.B.E. confirmed with Worden that Father would pull her hair, hit his former girlfriend, and hit all the children. The evidence of repeated domestic violence perpetrated by Father was sufficient to support a firm belief or conviction that Father engaged in a course of conduct that endangered the physical and emotional well-being of the children. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(E).

In addition to the evidence regarding domestic violence, the trial court also heard evidence that Father has a long history of abusing methamphetamines. "Conduct that subjects a child to a life of uncertainty and instability endangers the physical and emotional well-being of a child." *In re D.F.S.*, No. 04-20-00441-CV, 2021 WL 603364, at *4 (Tex. App.—San Antonio Feb. 17, 2021, pet denied) (mem. op.). "Thus, evidence of illegal drug use by a parent and its effect on a parent's life and her ability to parent may establish an endangering course of conduct under subsection (E)." *Id.* "While illegal drug use alone may not be sufficient to show endangerment, a pattern of drug use accompanied by circumstances that indicate related dangers to the child can establish a substantial *risk* of harm." *R.R.A.*, 687 S.W.3d at 278. "A reviewing court should not evaluate drug-use evidence in isolation; rather it should consider additional evidence that a factfinder could reasonably credit that demonstrates that illegal drug use presents a risk to the parent's 'ability to parent.'" *Id.*

According to Father's counselor, Father has been incarcerated fifteen times. He has seventeen charges for drug possession. *In re A.A.M.*, 464 S.W.3d 421, 426 (Tex. App.—Houston [1st Dist.] 2015, no pet.) ("Illegal drug use creates the possibility that the parent will be impaired or imprisoned and thus incapable of parenting."). Although Father disputes he has seventeen drug charges, he acknowledged he had at least eight to nine prior drug charges. *See In re E.A.M.V.*, No. 04-18-00866-CV, 2019 WL 1923214, at *4 (Tex. App.—San Antonio May 1, 2019, pet. denied) (mem. op.) (explaining a trial court could have disbelieved a parent's testimony, and we defer to the factfinder on witness credibility issues). Father admitted that he has been using drugs for over twenty years.

Although Father testified he was last arrested for drug charges approximately six or seven years earlier, the trial court heard testimony that Father tested positive for methamphetamines

twice during the pendency of this case. The trial court admitted into evidence two drug test results showing he was positive for methamphetamines. "Evidence that a parent continued to use illegal drugs even though the parent knew her parental rights were at risk is conduct showing a voluntary, deliberate, and conscious course of conduct, which by its nature endangers a child's well-being." *In re A.L.S.*, 660 S.W.3d 257, 271 (Tex. App.—San Antonio 2022, pet. denied). According to his counselor, Father has not accepted responsibility for his illegal substance abuse. When confronted with the positive drug tests, Father claimed he helped some people move furniture who were using methamphetamines and opined he must have been environmentally exposed to the drug. Sherrell Gibbs, the Departments substance use program specialist, testified that the metabolite, amphetamine, was not present when Father tested positive for methamphetamines. Gibbs stated that while this could mean Father was environmentally exposed to the drug, helping someone move furniture that contained drug residue a single time would not cause someone to test positive for methamphetamines. Someone would have to be living in or continuously in the environment containing the residue to have enough environmental exposure to prompt a positive drug test. Gibbs also testified that amphetamines are metabolized rapidly, so the absence of the metabolite could mean that the amphetamines were already flushed through Father's system when he took the drug test.

Father also blamed medications he was taking, shampoo he was using, and exposure to chemicals at a factory where he was working at the time for the positive drug results. Father provided Tellez with a list of his medications. Gibbs testified that none of the medications Father was taking would cause a positive drug test result for methamphetamines. According to Mother, Father was high on drugs around the children all the time. Father admitted he used drugs with Mother. Considering both parents were using drugs together, the trial court could have reasonably

inferred that Father was using drugs while either he, Mother, or both were supposed to be watching and caring for the children. *See A.A.M.*, 464 S.W.3d at 426 ("Drug abuse and its effect on the ability to parent can be part of an endangering course of conduct."); *R.R.A.*, 687 S.W.3d at 278 ("[A] pattern of parental behavior that presents a substantial risk of harm to the child permits a factfinder to reasonably find endangerment."); *D.F.S.*, 2021 WL 603364, at *4 ("[A] pattern of drug abuse will support a finding of conduct endangering a child even if there is no evidence that the drug use injured the child."). The trial court heard evidence that there was domestic violence and that the children's basic needs such as housing were not being met during the period that Father was using drugs. The trial court could have reasonably concluded that Father's drug use contributed to the endangering conditions the children endured before they were removed from the home. *See R.R.A.*, 687 S.W.3d at 278.

Having reviewed the record and considered all the evidence in the appropriate light for each standard of review, we conclude the trial court could have formed a firm belief or conviction that Father engaged in conduct which endangers the physical or emotional well-being of his children. TEX. FAM. CODE ANN. § 161.001(b)(1)(E); *see also H.R.M.*, 209 S.W.3d at 108; *J.P.B.*, 180 S.W.3d at 573. Therefore, we hold the evidence is legally and factually sufficient to support the trial court's subsection (E) finding.

Accordingly, Father's first issue is overruled.

### BEST INTEREST

In Father's second issue and Mother's sole issue, Father and Mother each argue the evidence is legally and factually insufficient to support a finding that termination of their parental rights is in their respective children's best interests.

When considering the best interest of a child, we recognize the existence of a strong presumption that the child's best interest is served by preserving the parent-child relationship. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). However, we also presume that prompt and permanent placement of the child in a safe environment is in the child's best interest. TEX. FAM. CODE ANN. § 263.307(a).

In determining whether a parent is willing and able to provide the child with a safe environment, we consider the factors set forth in section 263.307(b) of the Texas Family Code.[2] *See id.* § 263.307(b). We also consider the *Holley* factors.[3] *See Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). These factors are not exhaustive. *In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002). "The absence of evidence about some of these considerations would not preclude a factfinder from reasonably forming a strong conviction or belief that termination is in the child's best interest, particularly if the evidence were undisputed that the parental relationship endangered the safety of

---

[2] These factors include:

> (1) the child's age and physical and mental vulnerabilities; (2) the frequency and nature of out-of-home placements; (3) the magnitude, frequency, and circumstances of the harm to the child; (4) whether the child has been the victim of repeated harm after the initial report and intervention by the department; (5) whether the child is fearful of living in or returning to the child's home; (6) the results of psychiatric, psychological, or developmental evaluations of the child [or] the child's parents . . . ; (7) whether there is a history of abusive or assaultive conduct by the child's family or others who have access to the child's home; (8) whether there is a history of substance abuse by the child's family or others who have access to the child's home; (9) whether the perpetrator of the harm to the child is identified; (10) the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision; (11) the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time; (12) whether the child's family demonstrates adequate parenting skills . . . ; and (13) whether an adequate social support system . . . is available to the child.

TEX. FAM. CODE ANN. § 263.307(b).

[3] These factors include: (1) the child's desires; (2) the child's present and future emotional and physical needs; (3) any present or future emotional and physical danger to the child; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist the individuals seeking custody to promote the child's best interest; (6) the plans for the child by the individuals or agency seeking custody; (7) the stability of the home or proposed placement; (8) the parent's acts or omissions which may indicate that the existing parent-child relationship is improper; and (9) any excuse for the parent's acts or omissions. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976); *see also In re E.C.R.*, 402 S.W.3d 239, 249 n.9 (Tex. 2013).

the child." *Id.* In analyzing these factors, we must focus on the best interest of the child, not the best interest of the parent. *Dupree v. Tex. Dep't of Protective & Regul. Servs.*, 907 S.W.2d 81, 86 (Tex. App.—Dallas 1995, no writ).

Evidence that proves one or more statutory ground for termination may also constitute evidence illustrating that termination is in the child's best interest. *C.H.*, 89 S.W.3d at 28 (holding same evidence may be probative of both section 161.001(b)(1) grounds and best interest, but such evidence does not relieve the State of its burden to prove best interest). "A best-interest analysis may consider circumstantial evidence, subjective factors, and the totality of the evidence as well as the direct evidence." *See In re E.D.*, 419 S.W.3d 615, 620 (Tex. App.—San Antonio 2013, pet. denied). "A trier of fact may measure a parent's future conduct by his past conduct and determine whether termination of parental rights is in the child's best interest." *Id.*

### A. The Children

The trial court heard testimony that the children were removed once before in 2020. The family was living in Dallas at the time. Although disputed by Father, Worden testified the children were removed in the prior case because of concerns Father and Mother were using illegal drugs and exposing the children to domestic violence. Worden stated Father has been involved in four prior cases with the Department and Mother has been involved in ten prior cases with the Department. In those cases, the Department was again concerned with drug use and domestic violence. *See* TEX. FAM. CODE ANN. § 263.307(b)(2) (providing the trial court should consider the frequency and nature of out-of-home placements when determining a child's best interest). At the conclusion of that case, the children were all reunified with Father, and Mother was granted possessory conservatorship.[4]

---

[4] Although Father was not J.A.B.'s father, the trial court in the Dallas case granted Father sole managing conservatorship of J.A.B.

In those prior cases, neither parent had stable employment or housing. It is clear from the evidence that the parents' financial and housing instability has affected the children. For example, S.H., C.C.E.'s foster mother, testified that C.C.E. has a fear of being homeless and he expresses that anxiety often. S.H. has to comfort C.C.E. and assure him that he is not going to be homeless.

S.H. testified she has known the children since January 2021 and served as C.C.E. and M.B.E.'s foster placement when the children were previously removed in the Dallas case. She continued to have frequent contact with the children after they were reunified with Father. In the time between reunification in the Dallas case and removal in this case, S.H. would often keep all the children except J.A.B. while Father was living in a hotel and "trying to get it together." She cared for the three youngest children for approximately two months and enrolled them in school. When Father was unable to find stable housing in Dallas, he took the children with him to San Antonio. During this time, S.H. picked up the children to stay with her for a weekend. S.H. testified the weather was cold and she was concerned Father did not properly clothe the children because C.C.E., for example, was wearing shorts. S.H. stated the children were sick that weekend and she nursed them back to health. She said the children slept a lot while they were with her.

J.A.B., who was eleven years old at the time of trial, is placed at a residential treatment center. Worden testified J.A.B. often acts out. He gets into physical altercations with peers and one time he threw mulch at a teacher's face. Worden stated she receives two to three incident reports a week from J.A.B.'s school. He is easily frustrated and agitated and has a hard time sitting down and controlling his behavior. Worden indicated these behaviors are often present in children who have been exposed to domestic violence. J.A.B. wants to be placed in a foster home and Worden testified she has identified a foster family that is willing to foster J.A.B. and C.C.E. The

new foster placement would be a therapeutic foster home, and the foster parents are willing to adopt J.A.B. and C.C.E.

S.M.E., who was ten years old at the time of trial, is placed in a foster-to-adopt home with M.B.E., who was six years old at the time of trial. S.M.E. and M.B.E. both want to be adopted by their foster family. When asked to describe their relationship with the foster mother, Worden testified:

> They tell her that they love her very much. They always go back and forth with, "I love you more. I love you more."

> They are bonded to her. They—I had spoken with—tried to place the two girls in Dallas with [S.H.] and another family member of [S.H.'s] sister, but the girls actually said they wanted to stay where they were. But they kind of said, "But if we go with [S.H.], that's okay as well."

Worden testified there is a bond between S.M.E. and M.B.E. and their foster family, and they want to remain in that placement.

C.C.E., who was eight years old at the time of trial, was placed with S.H., the foster parent that fostered C.C.E. and M.B.E. when the children were removed in the Dallas case. S.H. testified C.C.E. never talked about Mother and doesn't talk much about Father. C.C.E. would tell S.H. that Father "really, you know, spanks them." He says he loves his dad, "but he's concerned" about him. S.H. opined C.C.E. "has a lot of concerns . . . for a little boy." In addition to C.C.E.'s anxieties about being homeless, S.H. stated C.C.E. also suffers anxiety "when it comes to his dad." When C.C.E. first came into her care he would cry every day at school and say his head or his stomach hurts. S.H. opined the symptoms were a reaction from his anxiety and she would talk with C.C.E. to calm him down. S.H. has discussed these issues with C.C.E.'s therapist indicating they are working on it together. When C.C.E. was told he was going to have a virtual visit with Father, he had a panic attack and did not go to the visit. Tellez approached C.C.E. to discuss

setting up another visit with Father. C.C.E. responded that "he love[s] his dad, but that he was not ready . . . to talk to him." Worden testified C.C.E. sometimes expresses the same violent behaviors that J.A.B. shows.

According to Worden:

[C.C.E.] is doing very, very well with [S.H.]  He is really bonded to her. She said she's had no problems with him since he's been there. Hasn't had—you know, he's not having acts of aggression. She said she will keep him as long as she needs to until we can find a placement for him. But she said he's just a joy. She really does love him a lot.

S.H. stated she is not willing to be a long-term placement for C.C.E. because she is older and is concerned she may not be around long enough for him to reach maturity. However, Worden testified S.H. is willing to serve as C.C.E.'s foster mother for as long as it takes to get him permanently placed with a foster-to-adopt home. As mentioned above, Worden has identified a foster placement for C.C.E. and J.A.B. Although C.C.E. wants to stay with S.H. forever, he has also indicated he would like to be placed with J.A.B. and that he misses his siblings. C.C.E has been doing well in school while in S.H.'s care and he made the honor roll.

The potential placement for J.A.B. and C.C.E. and the foster parents for S.M.E. and M.B.E. have both stated they are willing to maintain contact between the siblings.

*B. Father*

The evidence regarding Father's history of domestic violence and drug abuse is also probative of the trial court's best interest determinations. *See* TEX. FAM. CODE ANN. § 263.307(b)(7) (providing the trial court should consider whether there is a history of abusive or assaultive conduct by the parent when making a best-interest determination); *Id.* § 263.307(b)(8) (stating a parent's history of substance abuse is a factor considered by the trial court in determining the children's best interests); *J.O.A.*, 283 S.W.3d at 345 ("[E]ndangering conduct is not limited to

actions directed towards the child."); *A.A.M.*, 464 S.W.3d at 426 ("Drug use and the imprisonments relating to it harm the physical and emotional well-being of a child."). Although Father's most recent drug test in April 2025 was negative, the trial court could have concluded that Father's long history of drug abuse and his two positive tests during this case indicate it is likely that Father will relapse in the future, thereby creating an impermissible risk that the children will either be placed in physical or emotional danger or Father will be unable to provide for the children's physical and emotional needs. *See J.O.A.*, 283 S.W.3d at 346 ("While the recent improvements made by [a parent] are significant, evidence of improved conduct, especially of short-duration, does not conclusively negate the probative value of a long history of drug use and irresponsible choices.").

The trial court also heard testimony that Father tried to cover up the physical abuse perpetrated against J.A.B. As mentioned above, Father hit J.A.B. and then covered his mouth so others could not hear him. He made one of the children clean up J.A.B.'s blood before Father's girlfriend got home. When Jessica Barrera, the Department's removal investigator, investigated the incident, she asked J.A.B. how he got a black eye. J.A.B. told her that he fell at his uncle's house when he was riding either a bike or a scooter. However, his story was inconsistent with the other children's stories. One child stated Father punched J.A.B. in the face. Another child stated Father slapped J.A.B. in the face. The third child simply stated Father "did it, but she didn't say if it was a punch or a slap" and that Father covered J.A.B.'s mouth. A picture of J.A.B.'s black eye was admitted into evidence. Father on the other hand denied any physical abuse towards the children. He told Barrera that J.A.B. sustained his injury when he was fighting with his siblings. Father stated J.A.B. started screaming when he was fighting with his siblings, and Father covered J.A.B.'s mouth for approximately ten seconds so it wouldn't disturb anyone else. Father was arrested for injury to a child following the investigation.

In addition to the evidence regarding Father's history of domestic violence and drug use, the trial court also heard testimony that Father is unable to provide for the physical and emotional needs of the children. Father's counselor, Delilah Martinez, testified that she is concerned with Father's housing stability. Father was living at a shelter with the children before they were removed and was living at an extended stay hotel at the time of trial. Father testified that he has been staying at the hotel for "some months" but has stayed with his current roommates at the hotel for only a week. Father told Martinez he has plans to find a new place and is currently trying to save money for a deposit and first month's rent for an apartment. Martinez opined "the children need a stable home where they can feel safe at all times . . . and they need stability." Father admitted his current housing isn't safe for the children because he "barely know[s]the guy" that he is currently living with. When asked whether Father has living arrangements lined up if the children are reunified with him, Father responded: "Hopefully, yes."

Father's lack of financial stability also concerns Martinez who testified Father would need to demonstrate that he can provide for the children's basic needs such as housing, clothing, and food before she would feel comfortable recommending reunification. Father has had multiple jobs since the case began a little over a year before trial. In fact, Father testified he was fired from his previous job after only "a couple of days" because his employer claimed he was not showing up to work. Of course, Father disputes this and testified that he showed up to work but the trial court could have disbelieved Father's self-serving excuse. *See E.A.M.V.*, 2019 WL 1923214, at \*4 (explaining a trial court could have disbelieved a parent's testimony, and we defer to the factfinder on witness credibility issues). Father had only started at his current job two weeks before trial. Based on this evidence of Father's past conduct, the trial court could have reasonably inferred that Father will be unable to maintain stable employment in the future. *See E.D.*, 419 S.W.3d at 620

("A trier of fact may measure a parent's future conduct by his past conduct and determine whether termination of parental rights is in the child's best interest.").

Although Father has consistently attended individual counseling over the last year, Martinez stated she did not think Father was ready to be successfully discharged from therapy because he has unresolved substance abuse issues. Martinez iterated a concern that Father tested positive for methamphetamines during the pendency of this case and was making excuses for testing positive rather than dealing with his substance abuse. Martinez believes Father has been dishonest about the extent of his drug addiction and has not been "forthcoming" in therapy regarding his struggles. He would not admit to drug use and did not want to discuss substance abuse in counseling. According to Martinez, Father will seem to take responsibility for his actions but then makes excuses for his behavior. Martinez stated she is concerned that Father has been diagnosed with bipolar disorder and is not taking medication for his condition.

Martinez also stated she is concerned with Father's frequent arrests and how Father's criminal lifestyle might affect the children. "As a general rule, conduct that subjects a child to a life of uncertainty and instability endangers the physical and emotional well-being of a child." *A.L.S.*, 660 S.W.3d at 264. "Criminal conduct, prior convictions, and incarceration affect[] a parent's life and his ability to parent, thereby subjecting his child[ren] to potential emotional and physical danger." *In re J.J.O.*, No. 04-18-00425-CV, 2018 WL 5621881, at *2 (Tex. App.—San Antonio Oct. 31, 2018, no pet.) (mem. op.); *In re R.M.H.*, No. 04-23-00765-CV, 2023 WL 8103188, at *4 (Tex. App.—San Antonio Nov. 22, 2023, no pet.) (mem. op.) ("[R]outinely subjecting a child to the probability that [the child] will be left alone because [the child's] parent is in jail endangers the child's physical and emotional well-being."); *In re N.L.R.*, No. 04-23-01020-CV, 2024 WL 1184462, at *4 (Tex. App.—San Antonio Mar. 20, 2024, no pet.) (mem. op.)

(considering a parent's recent arrest as evidence the parent is unable to provide for the child's emotional and physical needs because it indicates instability, including the lack of a stable home).

To mitigate the concerns that led to removal, the Department created a service plan for Father. Father acknowledged he was provided a copy of the service plan and was aware of the services he needed to complete. Under his service plan, Father was required to participate in and successfully complete a parenting course, domestic violence program, individual counseling, substance abuse counseling, take a psychological assessment and follow all recommendations, pass random drug tests, and obtain and maintain stable housing and employment.

Worden disputed Father's contention that he successfully completed the parenting course. Worden testified Father did not improve in the areas he needed to under his initial assessment in the parenting course. Because he did not improve in these areas, Father received a participation certificate, not a completion certificate. When Worden told Father he did not successfully complete the parenting course, he told her that he believed he was successful in completing the course.

Worden confirmed Father only had one more class to complete his domestic violence program, but there was no way of knowing whether he successfully completed the program until an assessment is done to see if he successfully completed the objectives of the program. Father did not provide an excuse as to why he delayed so long before starting his domestic violence program. As mentioned above, Father has not been successfully discharged from counseling, despite a near perfect attendance.

Father completed his psychological assessment, and it was recommended that he seek psychiatric care for his mental illness. Father has not complied with this recommendation. Father

also has not completed drug treatment and has tested positive for methamphetamines on two drug tests during the pendency of the case.

"Continued illegal drug use by the parent is conduct that jeopardizes parental rights and may be considered as establishing an endangering course of conduct, and that termination is in the best interest of the child." *In re J.S.R.*, No. 04-21-00517-CV, 2022 WL 1559107, at *4 (Tex. App.—San Antonio May 18, 2022, pet. denied) (mem. op.) (alterations omitted). "Illicit drug use is relevant to multiple *Holley* factors, including the children's emotional and physical needs now and in the future, the emotional and physical danger to the children now and in the future, [the parent's] parental abilities, the stability of [the parent's] home, and the acts or omissions which may indicate an improper parent-child relationship." *In re A.N.*, No. 04-19-00584-CV, 2020 WL 354773, at *3 (Tex. App.—San Antonio Jan. 22, 2020, no pet.) (mem. op.). Although Father denied using drugs during the case, the trial court could have disbelieved Father and instead relied on the evidence showing that Father has a long history of substance abuse as well as the two methamphetamine-positive drug test results that were admitted into evidence. *In re K.M.*, No. 04-08-00037-CV, 2008 WL 2923655, at *2 (Tex. App.—San Antonio July 30, 2008, pet. denied) (mem. op.) (holding a parent's illegal substance abuse "places [the parent's] children in emotional and physical danger").

Father admitted at trial that he did not complete all his services and has not completed drug treatment. *See In re J.M.T.*, 519 S.W.3d 258, 270 (Tex. App.—Houston [1st Dist.] 2017, pet. denied) ("A [factfinder] may infer from a parent's failure to take the initiative to complete the services required to regain possession of his child that he does not have the ability to motivate himself to seek out available resources needed now or in the future."). When the children were removed in this case, there was a no-contact order from Father's criminal case that prevented him

from seeing the children. The no-contact order was eventually lifted, and Father was allowed visitation as permitted in this termination case. Myra Tellez, one of the Department's caseworkers, stated she set up a virtual visit between the children and Father; however, Father spent most of the time talking to Tellez rather than visiting the children. At the conclusion of the visitation, Father told the children "to tell everybody that he's not a monster." Tellez testified she was concerned Father was coaching the children and discontinued visits.

*C. Mother*

Father testified Mother last saw the children in person in October 2023, more than a year and half before trial; however, Mother testified she hasn't seen the children since April 2022. Father testified Mother did not see the children before the October 2023 visit even though she knew how to contact Father and the children. Father stated that at one point before the children were removed, Mother reached out to arrange a visit with the children, but they lost contact with her before the visit occurred. Mother never asked about the children during the whole time Father had custody of the children between removals. Mother admitted she only saw the children twice after the Dallas case was closed. When the children were removed in this case, Barrera was unable to contact Mother. The inability to contact Mother was consistent throughout the case. Tellez testified there were times while she was the caseworker where Mother would not return Tellez's calls or text messages, and Tellez was only able to contact Mother twice in the four months she was the caseworker. The court ordered Mother to have weekly virtual visits with the children, but Mother only visited the children five to seven times during the pendency of the case. Worden testified it was difficult to schedule visits with Mother. One time, Worden called and texted Mother multiple times before she would answer for a visit. Mother was scheduled for other visits

but failed to show for those visits with the children. Mother never gave a reason why she missed those visits. Worden testified Mother has not maintained significant contact with the children.

Aside from Mother's lack of significant contact with the children, the Department's main concerns were Mother's drug use, domestic violence, and financial and housing instability. To address the Department's concerns, Mother was provided a service plan. The service plan was made an order of the court. Mother admitted at trial that she received her service plan and that both Worden and Tellez went over the service plan with her. Mother's service plan, which was admitted into evidence, required her to participate in and successfully complete a parenting course, domestic violence program, individual counseling, substance abuse counseling, take a psychological assessment and psychiatric evaluation and follow all recommendations, pass random drug tests, and obtain and maintain stable housing and employment.

The trial court heard testimony that Mother completed her parenting classes and drug counseling, but nothing else. *See* TEX. FAM. CODE ANN. § 263.307(b)(10), (11) (providing the trial court considers the willingness and ability of the parent "to cooperate with and facilitate an appropriate agency's close supervision" and "to effect positive environmental and personal changes within a reasonable period of time" when determining whether parental termination is in the children's best interests). Mother acknowledged she did not complete her domestic violence classes, but the testimony indicates there may have been some confusion on what provider Mother was supposed to go to for the domestic violence course and whether the referrals were actually sent to the provider. Mother testified her service plan did not show which providers she was supposed to see and she never received the amended service plan showing the providers she was referred to. Mother testified she was not told which providers to go to until a week or two before trial. Worden clarified there were not specific providers listed in Mother's initial service plan

because Worden was unable to contact Mother to determine which providers were close to Mother. However, Worden testified she updated the service plan with providers in November 2024 and went over the amended service plan showing the providers with Mother. Worden also stated that Mother never indicated before Worden went on maternity leave in December 2024 that Mother had trouble contacting service providers.

Mother's failure to engage in services addressing domestic violence is concerning because the evidence showed that at one point Mother escaped her relationship with Father and fled to Florida with two of the children. However, Mother came back and resumed her relationship with Father again and the domestic violence continued. And, Worden testified that Mother exposed the children to a former paramour who held J.A.B. against the wall by his neck. The trial court could have reasonably concluded that Mother's choices to remain in relationships riddled with domestic violence show that she is unable to protect her children from harmful situations.

Mother admitted she has not completed individual counseling. Worden also acknowledged that Mother was not referred to a viable counselor until April 2024. However, the evidence indicates Mother never engaged in individual counseling at all.

Mother admitted she had a history of drug abuse and that she was using methamphetamines when the children were removed in the prior case in Dallas. Mother did not take drug tests during this case even though her service plan stated failure to take a drug test will be presumed positive. Mother stated she could not drug test because she did not have a valid ID. However, the courtesy worker offered to go with Mother so she could take the drug test. Mother never took up the Department's offer to help her facilitate a drug test. Worden testified Mother was referred for drug testing two weeks before trial. Mother responded she could not go on the day specified because she was helping a friend move until that Thursday. Worden told Mother to go that Thursday

instead; however, Mother responded she would not be available until after the testing facility closed. So Worden told Mother to go take the drug test on Friday. Then, Mother responded she could not go Friday because her car wasn't working. Worden then contacted a community-based worker who is contracted by the Department to contact Mother and provide her with transportation to take the drug test. The community-based worker attempted to contact Mother on that Friday and the following Monday, to no avail. Mother claims she is not currently taking drugs, but Worden could not verify this because Mother will not take a drug test for the Department. Given this testimony, the trial court could have disbelieved Mother's testimony that she is sober and instead concluded that Mother failed to take the drug tests because she was using drugs. *See In re A.M.L.*, No. 04-19-00422-CV, 2019 WL 6719028, at *4 (Tex. App.—San Antonio Dec. 11, 2019, pet. denied) (mem. op.) ("The trial court also could have reasonably inferred that [a parent's] failure to appear for drug testing indicated that [the parent] was avoiding testing because [the parent] was using drugs.").

The trial court also heard testimony that Mother experiences financial and housing instability. Mother told Tellez that she did "cleaning jobs here and there" but Mother never provided proof of income. Mother testified she has not earned any income the month of trial because her car was "out of commission[.]" Regarding housing instability, Tellez testified Mother was living either in her car or in a motel when Tellez was handling the case. Mother would never tell Worden where she lived, she just told her she stayed with friends from time to time and sometimes she stayed in her car. Mother testified she was living in a shelter at the time of trial. She stated she has been in and out of the shelter for the past couple of weeks and has been staying with friends when she is not at the shelter. Mother also testified she has been homeless during the pendency of the case.

Mother had not completed the psychological evaluation at the time of trial, although she testified she was scheduled to have the evaluation the day of trial. Worden testified Mother never completed her services in the prior case in Dallas. Mother also has an open case with the Department in Dallas involving another child that is not subject to this appeal. Finally, Father told Tellez that Mother previously engaged in prostitution in front of the children.

*D. Best Interests Summary*

Based on the evidence showing Father's history of domestic violence, substance abuse, and financial and housing instability, the trial court could have reasonably concluded that termination of Father's parental rights is in the children's best interests. The trial court heard testimony that the children love Father, but they are afraid of him because of their repeated exposure to domestic violence. The evidence also showed that the children's basic needs such as housing, food, and adequate clothing were not being met while they were in Father's care.

As to Mother, Worden succinctly stated it is in the children's best interests to terminate Mother's parental rights because she has not engaged in the services necessary to show positive and substantial change that would create a safe and stable environment for the children. Mother "lives mostly in her car." Worden stated Mother's testimony that she lives in a shelter was new information that Mother had not told Worden. Mother does not have a substantial bond with the children. Worden stated, at the beginning of the case, the three younger children did not even know who she was. They thought Father's former girlfriend was their Mother, and even J.A.B., who knew who Mother was, called Father's former girlfriend his "mom."

Worden opined neither parent is able to meet the children's physical needs now and in the future. According to Worden, the parents have "had a year to get it together and to be able to reduce the risk of neglect for these kids to be able to provide them with . . . a stable home, to gain

- 26 -

employment that's stable" and to be able to provide for their basic needs. She continued: "Neither parent is able to do that at this time."

Worden stated: "The children deserve a loving home where they can be taken care of and where their needs can be met. They don't have to worry about if they're going to have a house to live in for the next day or two or if they're going to have food in their home." The children's needs are being met in their current placements. The three youngest children are in loving foster homes and the evidence indicates they are thriving in those placements. Although J.A.B. is currently in a residential treatment center to work on his behavioral issues, Worden testified that she plans to move J.A.B. and C.C.E. to a therapeutic foster home where they can be placed together and heal from their childhood trauma. Further, none of the children expressed a desire to be reunified with Father and Mother. Each child expressed a desire to be placed in or remain in foster care. Considering C.C.E.'s fears of being homeless, the trial court could have reasonably concluded the children are fearful that they will go without basic necessities such as housing if they were returned to the parents, and that it is in the children's best interests to terminate Father's and Mother's parental rights so that the children can achieve permanency in their current or prospective foster-to-adopt homes.

Having reviewed the record and considered all the evidence in the appropriate light for each standard of review, we conclude the trial court could have formed a firm belief or conviction that termination of Father's and Mother's parental rights is in their respective children's best interests. *See id.* § 161.001(b)(2); *H.R.M.*, 209 S.W.3d at 108; *J.P.B.*, 180 S.W.3d at 573; *see also generally In re A.B.*, 437 S.W.3d 498, 503 (Tex. 2014) (recognizing a reviewing court need not detail the evidence if affirming a termination judgment). Therefore, we hold the evidence is legally and factually sufficient to support the trial court's best-interest findings.

Accordingly, Father's second issue and Mother's sole issue are overruled.

### CONCLUSION

We affirm the trial court's order terminating Father's and Mother's parental rights to their respective children.

Irene Rios, Justice